UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __9_/_1__

---------------------------------------------------------X
                  :
UNITED STATES OF AMERICA,     :        S2 14-CR-603 (VSB)
                  :
                  :
        -v-         :        **MEMORANDUM & OPINON**
                  :
ALCY ROSARIO,           :
                  :
            Defendant.   :
                  :
---------------------------------------------------------X

       Currently before me is the motion of Defendant Alcy Rosario ("Rosario") for a new trial

pursuant to Rule 33 of the Federal Rules of Criminal Procedure based upon new evidence—the

disclosure that Geovanny Florimon, one of the cooperating witnesses who testified for the

Government during Rosario's trial, lied during his testimony.  In the alternative Rosario requests

that I authorize subpoenas and other discovery regarding the other cooperating witness who

testified at his trial, Fausto Infante-Fernandez ("Fernandez").  Rosario also claims that evidence

revealed that Fernandez lied about his immigration application and that he committed

immigration fraud with the assistance of his wife.  Because I find that (1) Florimon's perjurious

testimony was not material; (2) Fernandez's testimony and the documentary and physical

evidence standing alone was sufficient to support the jury's guilty verdict; and (3) the evidence

identified by Rosario related to Fernandez was not new, material, and is cumulative, Defendant's

motion for a new trial is denied.  I also deny Rosario's request for a subpoena and discovery

because the Government provided Rosario with a copy of Fernandez's immigration alien file

("A-File"), and Rosario has failed to establish that he is entitled to additional discovery.

## I.     Background

The factual background can be found in my prior Memorandum and Order denying Rosario's initial motion for a judgment of acquittal pursuant to Rule 29(c), or in the alternative for a new trial pursuant to Rule 33 (the "9/16 M&O"); therefore, I include below on those facts relevant to deciding the pending motion.  (Doc. 85.)

## II.    Procedural History

The procedural history can be found in my 9/16 M&O and I will not repeat it here.  I include only the procedural history relevant for this decision.

On May 1, 2015, following a five-day jury trial that began on April 27, 2015, Rosario was convicted of conspiracy to steal government funds, in violation of Title 18, United States Code, Section 371 ("Count One"), theft of government funds, in violation of Title 18, United States Code, Sections 641 and 2 ("Count Two"), and aggravated identity theft, in violation of Title 18 United States Code, Sections 1028A and 2 ("Count Three").  At the close of the Government's case, Rosario moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure ("Rule") 29(a).  I found that there was sufficient evidence for the case to be presented to the jury.  Following the jury's verdict, Rosario renewed his motion for judgment of acquittal pursuant to Rule 29(c) and also moved, in the alternative, for a new trial pursuant to Rule 33.  By Memorandum & Order dated September 16, 2015, I denied Rosario's motions for judgment of acquittal and for a new trial.  (Doc. 85.)

On November 9, 2015, the Government disclosed to Rosario's counsel that, after being confronted by the Government, Florimon admitted that "he had not been truthful when he testified that [Hairold (or Hairo) Roman] had introduced himself to Florimon as 'William Diaz' and acknowledged that he had supplied Roman with the 'William Diaz' pseudonym," "so that

Roman could open a bank account into which fraudulently obtained or stolen Treasury checks were deposited." (Govt. Ltr. 2.)[1] By Order dated December 4, 2015, I directed the parties to meet and confer concerning a briefing schedule. (Doc. 94.) By letter dated December 21, 2015, Rosario indicated that he had filed his motion for a new trial on that same day and the parties proposed the remainder of the briefing schedule providing that the Government's opposition be due on January 29, 2016, and Rosario's reply on February 12, 2016. (Doc. 95.) Thereafter I granted several extensions requested by the Government, (Docs. 100, 106), and a request by Rosario to file a supplemental memorandum, (Doc. 101). Rosario filed his supplemental memorandum of law on March 23, 2016, (Doc. 102), the Government filed its opposition on May 2, 2016, (Doc. 107), and Rosario filed his reply on May 16, 2016, (Doc. 108).

### III.    Applicable Law

#### A.   *Motion for a New Trial Pursuant to Rule 33*

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Courts must "strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (internal quotation marks omitted). "It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). The Second Circuit has stated that:

> The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. There must be a real concern that an innocent person

---

[1] "Govt. Ltr." refers to the letter from Assistant United States Attorney David Zhou to William J. Harrington dated November 9, 2015.

may have been convicted.

*Ferguson*, 246 F.3d at 134 (citations and internal quotation marks omitted).

"The defendant bears the burden of proving that he is entitled to a new trial," *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009), and motions for a new trial filed more than fourteen days after the verdict is issued must be based on "newly discovered evidence," Fed. R. Crim. P. 33(b). "Relief under Rule 33 based on newly discovered evidence" requires a five-part "'showing that (1) the evidence [was] newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal.'" *United States v. Forbes*, 790 F.3d 403, 406-07 (2d Cir. 2015) (quoting *United States v. Owen*, 500 F.3d 83, 88 (2d Cir. 2007)). "A district court must exercise 'great caution' in determining whether to grant a retrial on the ground of newly discovered evidence, and may grant the motion only '*in the most extraordinary circumstances*.'" *United States v. Imran*, 964 F.2d 1313, 1318 (2d Cir. 1992) (alteration in original) (quoting *United States v. Di Paolo*, 835 F.2d 46, 49 (2d Cir. 1987)), *cert. denied*, 506 U.S. 1009 (1992).

**B. *Motion for a New Trial Based Upon Newly Discovered Evidence of the Government's Alleged Use of Perjured Testimony***

When a defendant seeks a new trial based upon newly discovered evidence of the Government's alleged use of perjured testimony the defendant must establish that: "'(i) the witness actually committed perjury;' (ii) 'the alleged perjury was material;' (iii) 'the government knew or should have known of the alleged perjury at time of trial;' and (iv) 'the perjured testimony remained undisclosed during trial.'" *United States v. Ferguson*, 676 F.3d 260, 282 (2d Cir. 2011) (emphasis omitted) (quoting *United States v. Zichettello*, 208 F.3d 72, 102 (2d Cir. 2000)). "A witness commits perjury if he gives false testimony concerning a material matter

4

with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001). If a court concludes that perjury was committed, "there are different standards of review on this issue depending upon whether the prosecution knew or should have known of the perjury." *United States v. White*, 972 F.2d 16, 21 (2d Cir. 1992). "[I]f the prosecution is charged with knowledge of the perjury, the conviction must be set aside 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Id*. (citing *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)). However, "[i]f the prosecution was unaware of the perjury, a new trial is warranted if the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *White*, 972 F.2d at 21 (internal quotation marks omitted).

## IV. <u>Discussion</u>

### A. *Florimon's False Testimony Was Not Material*

During the trial, Florimon during cross examination admitted that he had opened bank accounts with someone named William Diaz. (Tr. 307:24-25.)[2] Florimon acknowledged that he told the Government that William Diaz might not be his real name but that was how he identified himself to Florimon. (*Id*. 313:7-10.) He conceded that although he told the Government that he believed William Diaz was in Texas that he knew that he lived in Pennsylvania, and is married to Florimon's wife's cousin. (*Id*. 313:13-314:14.) He also admitted during cross examination that he knew William Diaz was a pseudonym for Hairo Roman, but persisted in claiming that he had not disclosed Roman's real name to the Government prior to trial because Roman had originally introduced himself to Florimon as William Diaz. (*Id.* 318:11-23.) Florimon denied that he was

---

[2] "Tr." refers to the transcript of the trial of Alcy Rosario.

trying to protect a family member and continued to insist during cross examination that he did not know William Diaz's real name prior to trial even when he was confronted with the fact that he had entered the name Hairo instead of William Diaz in the contacts of his cellular telephone. (*Id*. at 318:11-23; 320:9-24; 321:3-10; 322:3-25.) After trial, the Government disclosed that, after being confronted by the Government, Florimon admitted that "he had not been truthful when he testified that [Hairold (or Hairo) Roman] had introduced himself to Florimon as 'William Diaz' and acknowledged that he had supplied Roman with the 'William Diaz' pseudonym" "so that Roman could open a bank account into which fraudulently obtained or stolen Treasury checks were deposited." (Govt. Ltr. 2.)

The parties agree that Florimon lied during his trial testimony related to William Diaz, that his lies constitute newly discovered evidence, and that the Government was unaware Florimon was lying during his testimony. (Def.'s Mem. 5-6; Govt. Mem. 3-5.)[3] Rosario, however, argues that Florimon's "testimony was so material to the jury's finding of guilt that, absent the perjurious testimony, the jury probably would not have convicted Mr. Rosario." (Def.'s Mem. 6.) I disagree. Florimon's lies were not material, and did not go to the essence of the Government's case against Rosario.

Rosario argues that Florimon's lies were critical to the case against him stating that "Florimon's testimony directly implicated [him] as understanding the scope of the conspiracy when he opened bank accounts for Florimon and deposited checks," and that therefore "Florimon's testimony about his co-conspirators was thus central to the Government's case against Mr. Rosario." (Def.'s Mem. 6-7.) This argument is misplaced, and does not support a

---

[3] "Def.'s Mem." refers to Defendant Alcy Rosario's Memorandum of Law in Support Of His Rule 33 Motion for a New Trial Based on Newly Discovered Evidence. (Doc. 97.) "Govt.'s Mem." refers to Government's Memorandum of Law in Opposition to Defendant's Motion for a New Trial. (Doc. 107.)

finding that Florimon's lies were material.

There is no claim or evidence that Florimon lied about Rosario's participation in the conspiracy to steal government funds, theft of government funds, and theft of the identities of innocent victims. Instead, Florimon lied about knowing Roman's real name, and that he had provided Roman with the name William Diaz to open up a bank account as part of the Treasury check scheme. (Govt. Ltr. 2.) There was no evidence presented during the trial that suggested that Rosario was told about, interacted with, or knew Roman or someone going by the name Willliam Diaz. In other words, despite Rosario's attempt to link Florimon's testimony about Roman to his testimony about Rosario, there is no factual connection in the record to support that claim. These facts do not support Rosario's claim that Florimon's testimony about William Diaz was "central to the Government's case against [him]." (Def.'s Mem. 6.)

Moreover, contrary to the suggestion embedded within Rosario's argument, the Government has not claimed or argued that Florimon's testimony—or any evidence it presented for that matter—"directly implicated [] Rosario as understanding the scope of the conspiracy." Indeed, the law does not require[4] and the jury was specifically instructed that Rosario need not have been aware of the full scope of the conspiracy to be found guilty of being a participant. (*See* Tr. 788:3-788:18) ("Knowledge is a matter of inference from facts proved. To have guilty knowledge, a defendant need not know the full extent of the conspiracy, or even who all coconspirators are. Similarly, a defendant need not know all of the actives of the conspiracy.

---

[4] *See, e.g.*, *United States v. Gleason*, 616 F.2d 2, 16 (2d Cir. 1979) ("To be convicted as a member of a conspiracy, a defendant need not know every objective of the conspiracy, every detail of its operation or means employed to achieve the agreed-upon criminal objective, or even the identity of every co-conspirator." (citations omitted)); *see also* Leonard B. Sand et al., Modern Federal Jury Instructions—Criminal ¶ 19.01, Instruction 19-6 ("The defendant's knowledge is a matter of inference from the facts proved. In that connection, I instruct you that to become a member of the conspiracy, the defendant need not have known the identities of each and every other member, nor need he have been apprised of all of their activities. Moreover, the defendant need not have been fully informed as to all of the details, or the scope, of the conspiracy in order to justify an inference of knowledge on his part. Furthermore, the defendant need not have joined in all of the conspiracy's unlawful objectives.").

Indeed, a single act may be enough to bring one within the membership of the conspiracy, provided that the defendant was aware of the conspiracy and knowingly associated himself with its criminal aims.").  Therefore, Rosario need not have been aware of Roman and/or his participation in the Treasury check scheme for the jury to find him guilty.

Although Florimon lied during his testimony, he never claimed either before or during his trial testimony that Roman did not have knowledge of and involvement in the Treasury check scheme.  In fact—although referring to Roman as William Diaz during his meetings with the Government—Florimon implicated Roman in the Treasury check scheme.  Specifically, Florimon told the Government that William Diaz might not be his real name, (Tr. 313:7-8), Diaz came to know the illegal nature of the Treasure check scheme, (*id.* at 312:4-6 ("[Diaz] got to know the whole nine yards[.]")), and Florimon identified one or more photographs of Diaz during his meetings with the Government, (*id.* at 311:12-25).  In addition, during cross examination, Florimon admitted to various damaging facts about Diaz/Roman and his own knowledge about Diaz/Roman, including that (1) Diaz/Roman participated in the Treasury check scheme, (*id.* at 312:4-23); (2) he knew Diaz's real first name, despite never having told the Government, (*id.* at 318:11-19); (3) he knew, after initially denying, Diaz's real last name, (*id*. at 318:17-23, 320:1-8); (4) he had a close relationship with Diaz, who was married to the cousin of Florimon's wife, (*id*. at 314:11-14); and (5) he had Diaz's phone number stored in his own phone under Diaz's real name, Hairo, (*id*. at 322:7-20).  During closing arguments defense counsel argued Florimon's answers and hesitancy in answering questions about Diaz demonstrated that Florimon lied during his testimony.  (*See, e.g.*, *id.* at 724-25 ("He didn't even answer the question.  He just repeated the same thing, I know him as William Diaz.  And then I began asking some more questions. . . . I asked William Diaz, the man you told the government you

didn't know where he was in Texas is in fact married to your wife's cousin. Yes."); *id.* at 726

("You never knew his name was Hairo Roman? Not the full name. Then I showed him a

document. He says, yes, I recognize the Hairo, yes. Finally he says, I know that is his last

name.") (Florimon was "trying to figure out a way to make this story make sense and he is a

skilled liar, so he tells little lies."); *id.* at 726-27 ("The little lie he tells here, at the time I spoke

to the government I knew him as William Diaz. . . . So his whole story, the newly adapted lie,

which is, well, I spoke to the government, I knew him as William Diaz . . . I mean, it almost -- it

was almost -- should have ended like in a mercy call early because it was so obvious by this

point that he was just lying and was going to lie and lie and lie and change the story little by little

in the hope of figuring out a way to make it believable."); *id.* at 727 (Florimon was a "good liar"

who "knows how to avoid getting caught.").)  After considering defense counsel's cross

examination and his arguments during summation that Florimon had lied about Diaz, I find that

the further disclosure to the jury that Florimon had known Diaz's real name prior to trial, and

that Florimon had in fact provided Roman with the name William Diaz to use in opening up a

bank account to facilitate the Treasury check scheme, would have added little for the jury, which

already had ample reason to discount Florimon's testimony.  *See United States v. Wong*, 78 F.3d

73, 80 (2d Cir. 1996) (ruling that additional evidence from other proceedings related to a witness

was not material in part because defense counsel had been able to attack the witness's credibility

in closing arguments based on his inconsistent trial testimony).  The additional disclosures that

Florimon lied about knowing Roman's real name, and that Florimon had provided Roman with

the name William Diaz to open up a bank account as part of the Treasury check scheme, (Govt.

Ltr. 2), amounted to cumulative evidence that Florimon had lied about and not fully disclosed his

knowledge about William Diaz to the Government.

Therefore, for the reasons stated above, I find that Florimon's lies were not material.

**B.** ***Even Without Florimon's Testimony There Was Sufficient Evidence to Support the Jury's Verdict***

Rosario argues that when the testimony of the Government's other cooperating witness, Fausto Infante-Fernandez, is viewed in the context of the cross examination by his attorney and the purported new impeachment evidence, the jury would not have credited Fernandez's testimony. Specifically, Rosario claims that Fernandez's "veracity was deeply suspect at the time of trial and raises serious questions about whether he also committed perjury while on the stand during Mr. Rosario's trial" and then argues that "jury probably would have discounted Infante-Fernandez's testimony but for the fact that his testimony was corroborated by Florimon's." (Def.'s Mem. 8-9.) This argument is flawed because Rosario fails to analyze all of the evidence offered against him during trial, and the evidence identified by Rosario related to Fernandez was not new, or material.

### 1. The Evidence Without Florimon's Testimony Was Sufficient to Support the Jury's Verdict

As an initial matter, there was ample evidence of Rosario's guilt without Florimon's testimony. That evidence included the testimony of Fernandez, the testimony of victims, as well as physical evidence, including bank records, copies of fraudulently obtained Treasury checks, corporate records, and a bank surveillance photograph of Rosario depositing fraudulently obtained Treasury checks in the names of two of the victims who testified during the trial at a Bank of America branch in Danbury, Connecticut on February 25, 2013.

Fernandez's testimony at trial established that Florimon was an owner of Noni Car Dealership in the Bronx ("Noni"), a used car dealership, (Tr. 366:10-13), and Fernandez worked at Noni, (*id.* at 365:6-8). Fernandez later started his own car dealership in Yonkers. (*Id.* at

273:17-18; 402:22-25.)  Rosario and Fernandez knew each other from the Dominican Republic, and Rosario introduced Fernandez to Florimon.  (*Id*. at 367:2-6.)  Because of their friendship, Florimon let Rosario work off-the-books odd jobs at Noni.  (*See id.* at 437:2-4, 14-19.)

Fernandez testified that they began buying fraudulently obtained Treasury checks at Noni in approximately the middle of 2012, initially from a check supplier named Papalito.[5]  (*Id.* at 428:15-429:5.)  Rosario was not involved in the Treasury check scheme during the time Florimon was getting checks from Papalito.  (*Id.* at 430:10-11.)  A few months later when Florimon became dissatisfied with his relationship with Papalito, (*id.* at 430:3-9), Florimon and Fernandez began purchasing Treasury checks from four other suppliers of Treasury checks— Fifo, Wellington, and Galon, (*id.* at 369:7-10; 373:7-16; 377:17-22).  Fifo, Wellington, and Galon also brought the Treasury checks to Noni in the Bronx, (*id.* at 378:10-16, 560:12-17), and they sometimes had discussions in Spanish in Rosario's presence about, among other things, payment terms, i.e., the percentage of the Treasury checks they would each receive, (*id.* at 560:18-24).[6]

Fernandez testified that Rosario was present on certain occasions when:  (1) the suppliers handed loose Treasury checks to Florimon; and (2) either he or Florimon removed the Treasury checks from envelopes provided to them by the suppliers.  (*See id.* at 378:17-22; 381:2-10.)  If the checks were not endorsed, Florimon or Fernandez forged the signatures at Noni.  (*Id.* at 383:19-21.)  Fernandez typically filled out the deposit slips at Noni.  (*See id.* at 386:1-3.)  At times, Rosario was present at Noni when the checks were delivered by the suppliers, and they spoke Spanish during these transactions.  (*See id.* at 560:12-24.)  Fifo, Jay, Wellington, and

---

[5] Papalito is also known as "Papo" or "Wendi."  (*See id.* at 373:8-23; 428:15-22.)

[6] Spanish is Rosario's native language.  (*See id.* at 193:23-25; 194:12-13.)

Galon delivered approximately three to five checks per week to Florimon or Fernandez at Noni. (*Id.* at 381:11-14.)  Fernandez testified that Florimon made statements like "oh, we have to go to the bank and take the checks, the [T]reasury checks, to make the deposit today" in the presence of Rosario at Noni.  (*Id.* at 389:7-14.)  Florimon also sometimes said "we are going to work today, we are going to make money" in Rosario's presence on days when suppliers brought him checks.  (*Id.* at 561:5-20.)

Starting around the end of 2012, Rosario drove Fernandez and Florimon approximately ten times to bank branches in New Jersey and Connecticut to deposit Treasury checks.  (*Id.* at 387:17-388:7; 559:1-13.)  Fernandez and Florimon decided to deposit checks outside of New York City after an initial deposit at a bank in New York City was rejected.  (*Id.* at 387:10-16.)  On some of his car trips with Rosario, Fernandez filled out deposit slips in the car and told Rosario that "we are going to go to the bank to make the deposits of the [T]reasury checks."  (*Id.* at 389:19-390:7.)

In December of 2012, Florimon asked Rosario to open bank accounts into which more Treasury checks could be deposited.  (*Id.* at 401:10-24.)  Rosario used his driver's license to open business bank accounts for a fictitious business called Millenium Renovation at both Sovereign Bank[7] and Bank of America.  (*See id.* at 392:1-12; GX 103, at 5; GX 107, at 2, 217.)  Fernandez testified that Millenium Renovation was not a real business or operating business, and its "only purpose was to deposit the [T]reasury checks into the account."  (Tr. 392:11-20.)   The

---

[7] In approximately 2008, Santander Bank purchased Sovereign Bank, and for a period of several years the combined bank used dual branding and used both names.  (Tr. 149:11-21.)  Between February 25, 2013 and October 21, 2013 there was $318,733.40 deposited in the Santander Millenium Renovation account opened by Rosario.  (GX 601.) "GX" refers to the Government exhibits entered into evidence during the proceedings.  Cash withdrawals from this account using withdrawal slips with Rosario's driver's license number on them, one check written to Rosario, and checks written to Leiby Martinez, Rosario's girlfriend, (Tr. 155:25-156:3), between February 25, 2013 and October 16, 2013 total $63,372.50, (GX 602).

address listed on the monthly account statements from both banks matched the address on Rosario's driver's license: "1223 Bronx River Ave Apt 1F, Bronx, NY 10472." (*See* GX 103, at 5; GX 107, at 2, 217.) That was the same address that was listed as the "Home address" on the 2010 and 2013 federal income tax returns filed by Rosario. (GX 301_R, at 2; GX 302_R, at 2.)

On February 21, 2013, Rosario withdrew $3,000 in cash from a teller from the Bank of America Millenium Renovation account at a branch on Westchester Avenue in the Bronx. (GX 105; GX 600.) Rosario also received and deposited a number of Treasury checks, including ones made out in the names of the victims of the aggravated identity theft—Pedro Figueroa or Brenda Rivera Ramos, into the same Millenium Renovation account. (GX 107, at 114-15.) These deposits were made at a Bank of America branch in Danbury, Connecticut on February 25, 2013, in the total amount of $15,510.54.[8] (*See* GX 601.) The Government introduced bank deposit records and a bank surveillance photograph of Rosario making these deposits. (Tr. 355:14-358:7; GX 103, at 39-41; GX 106.)

Within a month or so of making the deposits in Danbury, Rosario and Fernandez again discussed the Treasury check scheme and they each expressed their unhappiness with the fact that Florimon was keeping for himself most of the profits from their fraudulent scheme. (Tr. 390:8-391:22.) During this conversation, Rosario told Fernandez that he wanted to leave the dealership. (*Id.*) A few months later, Fernandez and Rosario each had a falling out with Florimon and each left Noni. (*Id.* at 393:4-394:13.)

Fernandez bought his own car dealership in Yonkers, New York called Yonkers Auto Sales. (*Id.* at 403:1-4.) He continued the Treasury check scheme by purchasing checks from Galon and Wellington at various locations in the Bronx, (*id.* at 403:14-404:11), and depositing

---

[8] The total amount deposited into the Bank of America Millenium Renovation account was $24,820.54. (GX 601.)

Treasury checks into various business bank accounts, (*id.* at 404:23-405:14).

In about the summer of 2013, Rosario joined Fernandez at Yonkers Auto Sales. (*Id.* at 403:5-13.) During this time period, Rosario asked Florimon for the documentation that Florimon kept at Noni for the two Millenium Renovation bank accounts opened by Rosario, and Florimon gave the documents to Rosario. (*Id.* at 393:4-394:8.) After obtaining the documentation back from Florimon, Rosario permitted Wellington to make deposits into the Millenium Renovation bank account at Santander Bank, (*id.* at 405:15-408:19), and received payment from Wellington after Wellington deposited Treasury checks into this account, (*id.* at 408:3-19).

Fernandez also told Rosario he was going to open other accounts for fictitious businesses into which Treasury checks could be deposited, and he eventually opened an account in the name of Omega Car Sales ("Omega"). (*Id.* at 418:12-25; 419:7-11.) Rosario agreed to withdraw money from the Omega account by taking Omega business checks from Fernandez and depositing the money in his account. (*Id.* at 422:1-8, 16.) Rosario would withdraw the funds from his bank account, turn the money over to Fernandez, and Fernandez would pay Rosario for his efforts. (*Id.* at 422:1-423:4.)

Finally, Rosario opened a new bank account at Santander Bank in May 2013 into which Treasury checks could be deposited, the WEALFA Management Group Inc. account. (*Id.* at 415:13-417:10; GX 110, at 65-75.) Since Wellington, Rosario and Fernandez were going to work together using the WEALFA account, Fernandez came up with the name for the account by joining the first two letters of the names of **We**llington, **Al**cy, and **Fa**usto. (Tr. 417:20-23.) Fernandez testified that he did not deposit any Treasury checks into the WEALFA account and he did not know whether or not Rosario had deposited Treasury checks into that account. (*Id.* at 417:24-418:4.) Although Fernandez was unaware of whether or not Rosario used the WEALFA

account, bank records showed that between October 3, 2013 and October 18, 2013, Treasury checks totaling $18,996.74 were deposited into the Santander WEALFA account, (GX 605), and that beginning in August 2013 until October 2013, cash withdrawals totaling $20,150.00 were made from the Santander WEALFA account by using withdrawal slips with Rosario's driver's license number written on them, (GX 604).

Based upon my review of the above evidence, I find that the testimony of Fernandez, when viewed in conjunction with the victims' testimony and voluminous bank records and other physical evidence, including a photograph of Rosario depositing fraudulently obtained Treasury checks in the names of two of the victims who testified during trial at a bank in Connecticut, provides more than sufficient evidence to uphold the jury's guilty verdict. In addition, the record establishes that Rosario continued the Treasury check scheme after Fernandez and Rosario had a falling out with Florimon in or around mid-2013, including by opening and using the WEALFA account.

Rosario also argues that Fernandez testified that Rosario was not aware of the Treasury check scheme until April 2013 and therefore there was insufficient evidence to support the jury's verdict on Count Three of the Indictment related to Rosario's February 25, 2013 deposits. (Def.'s Reply 4-5.)[9] This argument is flawed for a number of reasons. First, Fernandez testified that it was his "understanding" that Rosario was not aware of the "entire scheme until he had it out with [Florimon]," and that until the spring of 2013 he had not had a conversation with Rosario about the account. As noted above, the jury was not required to find that Rosario was aware of the "entire scheme" in order to find him guilty. Nor was it necessary for Fernandez or

---

[9] "Def.'s Reply" refers to Defendant Alcy Rosario's Reply Memorandum in Support of His Rule 33 Motion for a New Trial Based on Newly Discovered Evidence. (Doc. 108.)

any other co-conspirator to explicitly explain to Rosario the nature of the Treasury check scheme. Therefore, contrary to Rosario's suggestion, Fernandez's testimony does not support a finding that Rosario had no knowledge of the illegal nature of the Treasury check scheme until the spring of 2013. Second, accepting Rosario's characterization of Fernandez's testimony, the jury's verdict of Rosario's guilt on Count Three need not have been based solely on Fernandez's "understanding" of Rosario's awareness of the scheme. Third, there was overwhelming evidence in the record even without considering Fernandez's testimony for the jury to have determined that Rosario was aware of the Treasury check scheme prior to February 25, 2013. The evidence that supported the jury's verdict on Count Three and Rosario's awareness of the Treasury check scheme prior to February 25, 2013 included: (1) Rosario's presence at Noni when the checks were delivered by the check suppliers—Fifo, Jay, Wellington, and Galon—who spoke Spanish during these deliveries; (2) during some of the deliveries of Treasury checks Florimon made statements in Rosario's presence like "oh, we have to go to the bank and take the checks, the [T]reasury checks, to make the deposit today," (Tr. 389:7-14), and "we are going to work today, we are going to make money," (*id.* at 561:5-20); (3) starting around the end of 2012, Rosario drove Fernandez and Florimon approximately ten times to bank branches in New Jersey and Connecticut to deposit Treasury checks, (*id.* at 387:17-388:7; 559:1-13); (4) during some of his car trips with Rosario, Fernandez filled out deposit slips in the car and told Rosario that "we are going to go to the bank to make the deposits of the [T]reasury checks," (*id.* at 389:19-390:7); (5) in December of 2012, Florimon asked Rosario to open bank accounts into which more Treasury checks could be deposited and Rosario used his driver's license to open business bank accounts for a fictitious business called Millenium Renovation at both Sovereign Bank and Bank of America; (6) the address listed on the monthly account statements from both banks matched the

address on Rosario's driver's license and the home address listed on his 2010 and 2013 federal income tax returns; and (7) on February 21, 2013, Rosario withdrew $3,000 in cash from a teller from the Bank of America Millenium Renovation account at a branch on Westchester Avenue in the Bronx.

Furthermore, Fernandez's understanding of the point at which Rosario became aware of the Treasury check scheme was susceptible to imprecision. Indeed, Fernandez's own testimony failed to specifically point to April 2013. (*See* Tr. 449:4-8 ("Q: So this takes us to basically the spring of 2013, correct? A: Yeah. Like April, more or less . . . .").) The jury could have reasonably concluded that the period between February 25, 2013 and April 2013—a mere 35 days—was not enough of a time lapse to conclude that Rosario was not aware of the Treasury check scheme prior to February 25, 2013. In other words, the stark lines that Rosario seeks to draw with regard to dates is not supported by the evidence or the law.

### 2. Fernandez's Immigration Alien File Was Not Newly Discovered Evidence nor was it Material

Rosario argues that Fernandez's A-File constituted newly discovered evidence that purportedly demonstrates that Fernandez lied at trial about his immigration application and therefore had violated his cooperation agreement prior to trial by hiding his immigration fraud. (Def.'s Supp. Mem. 3; Def.'s Reply 5-8.)[10] Rosario also argues that Fernandez was involved in a credit card fraud scheme after the trial.[11] (Def.'s Supp. Mem. 9.) In response the Government

---

[10] "Def.'s Supp. Mem." refers to Defendant Alcy Rosario's Supplemental Memorandum in Further Support of His Rule 33 Motion for a New Trial Based on Newly Discovered Evidence. (Doc. 102.)

[11] According to the Government "[f]ollowing an investigation, [it] determined that the [credit card fraud] allegation [was] unfounded because Fernandez was hospitalized at the time of the suspicious credit card transaction." (Govt. Mem. 11.) Rosario did not address the credit card fraud allegation in his reply so I consider that claim abandoned. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) ("Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended."); *Robinson v. Roosevelt Union Free Sch. Dist.*, No. 10-CV-834 SJF ETB, 2012 WL 1980410, at *6 (E.D.N.Y. May 31, 2012) ("[T]he Court considers this claim abandoned because plaintiff has failed to address it in her opposition brief."). In any event, this allegation lacks factual support

argues that the A-File cannot be considered newly discovered evidence since Rosario was aware of it prior to trial, and, in any event, the A-File is not material and is cumulative. (Govt. Mem. 11.) The Government is correct. Rosario's arguments have no merit because the A-File (1) was not newly discovered evidence, (2) was not material, (3) was cumulative, (4) was impeachment evidence, and (5) would not likely have led to Rosario's acquittal.

a. The A-File Was Not Newly Discovered Evidence

The law is clear that a new trial may not "be granted pursuant to Rule 33 on the basis of evidence that was known by the defendant prior to trial, but became newly available after trial." *Owen*, 500 F.3d at 89. "One does not 'discover' evidence after trial that one was aware of prior to trial." *Id.* at 89-90. The Second Circuit has also "held that the 'assertion that [the defendant] had no reason to procure [the allegedly newly discovered] evidence for trial because he had not anticipated certain government tactics and arguments is unconvincing. The evidence in question all pertained to matters that [the defendant] knew would be in issue at trial, even if he did not know the government's exact position on these matters.'" *United States v. Gupta*, 426 F. App'x 12, 13 (2d Cir. 2011) (alteration in original) (quoting *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005)).

It is undisputed that Rosario requested the A-File during and after trial. (Govt. Mem. 13; Def.'s Mem. 10, n.4 ("Defense counsel asked the Government during trial and again more recently whether it would produce Infante-Fernandez's immigration file. The Government has said that it does not have this file and would not obtain it absent a Court Order.").)[12] It is also

_____

in the record, and since it is alleged criminal conduct by Fernandez that occurred after the trial it could not be considered newly discovered evidence since it could not have impacted the jury's verdict. *See United States v. Rommy*, 486 F. App'x 172, 174 (2d Cir. 2012) ("[I]n order to warrant a new trial, a defendant must show at least a reasonable likelihood that the result of the proceeding would have been different had the newly discovered evidence . . . been introduced.").

[12] I note that I did not receive a request for an order that the A-File be produced, and did not become aware of

not disputed that the A-File contained, among other documents, Fernandez's application for conditional permanent residency filed in June 2012 (the "June 2012 Application"), his application to remove conditions to Fernandez's legal permanent residency submitted in July 2014 (the "July 2014 Application"), that both of these forms were part of the A-File at the time of trial in the Spring of 2015, and that Fernandez had disclosed in the June 2012 Application that he had been arrested.  (*See* Fernandez 3501-01 ("Perminent [sic] Resident – Had submitted the Perminent [sic] Resident request – Told them that he had been arrested – They need a letter of disposition.").)

Rosario does not dispute that he was "generally aware of the existence of an immigration application filed by Infante-Fernandez," that he made requests for the A-File before and after trial, but claims that he "had no way of knowing the contents of the A-file, and had no means of doing so until the Government recently provided the document."  (Def.'s Reply 5, 7.)  Rosario then claims that his case is distinguishable from *United States v. Owen*, 500 F.3d 83, 89 (2d Cir. 2007), because he "had no way of knowing that Infante-Fernandez's A-file contained lies about his prior crimes, his address, and the status of his marriage."  (Def.'s Reply 6.)  Rosario's attempt to distinguish *Owen* is unavailing.  While Rosario may not have known the exact contents of the A-File he clearly knew or believed that it contained or at least might contain information useful to his defense otherwise he would not have requested the file from the Government and his attorney would not have cross-examined Fernandez about matters related to his immigration filings.  Moreover, the questions and information requested by the immigration forms at issue would be the same for all aliens so Rosario knew or should have known the exact questions and

Rosario's request for the A-File until the filing of the instant motion.  According to the Government, it declined Rosario's request for the A-File because "it did not have custody or control over" it.  (Govt. Mem. 14.)

information that the forms in the A-File would contain.  Rosario was aware of the general

contents of the A-File and the fact that he did not know the exact answers provided by Fernandez

does not make the A-File new evidence.  Rosario's situation is analogous to the defendant's in

*Gupta*.  *See* 426 F. App'x at 13 (finding documents did not qualify as newly discovered evidence

where defendant claimed he had no reason to procure the allegedly newly discovered evidence

for trial because he did not anticipated government's tactics and arguments since defendant knew

evidence in question would be in issue at trial).  I find that Rosario knew the general contents of

the A-File, he injected issues related to the A-File into the trial through his cross examination,

and therefore the A-File cannot be considered newly discovered evidence within the meaning of

Rule 33.  To hold otherwise would create the perverse situation where a defendant could

intentionally not request or obtain documents for trial that he knows or believes contain

information relevant to his case only to request them after trial and argue that they are newly

discovered evidence warranting a new trial.

### b.  The A-File Is Not Material

The A-File did not contain evidence relevant to any of the elements of the offenses for

which the jury convicted Rosario.  In other words, the A-File is not evidence related to the

Government's case against Rosario.  Instead, as Rosario concedes, the A-File qualifies as

impeachment material for Fernandez, and as such probably was not even admissible as evidence.

(Def.'s Reply 7.)  Therefore, the A-File had no probative value directly related to the charges

against Rosario, and as such was not material.

Rosario has also failed to establish that the A-File meets the legal criteria to be

considered material.  The Second Circuit held in *United States v. Wong*, 78 F.3d 73, 79 (2d Cir.

1996) that evidence of impeachment is material if the witness whose testimony is attacked either

(1) supplied the only evidence linking a defendant to a crime, or (2) where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case. However, impeachment evidence is not material where the new impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.  *Id.*; *see also United States v. Orena*, 145 F.3d 551, 559 (2d Cir. 1998) ("It is well settled that where ample ammunition exists to attack a witness's credibility, evidence that would provide an additional basis for doing so is ordinarily deemed cumulative and hence immaterial.").

Here, Fernandez's testimony was not the only evidence linking Rosario to the charged crimes.  As discussed above, Fernandez's testimony was corroborated by the testimony of victims, as well as physical evidence admitted during the trial, including bank records, copies of fraudulently obtained Treasury checks, corporate records, and a bank surveillance photograph of Rosario depositing fraudulently obtained Treasury checks in the names of two of the victims who testified during the trial at a Bank of America branch in Danbury, Connecticut on February 25, 2013.

In addition, Fernandez's credibility was impeached in various ways.  For example, he was cross-examined extensively about the circumstances of his marriage to Marlenny Ramirez, a United States citizen, and its connection to his efforts to become a citizen.  Specifically, Rosario's counsel elicited that (1) only one guest attended Fernandez's wedding, (Tr. 507:21-24); (2) after he got married, Fernandez lived "on and off" between Ramirez's mother's house and with Florimon purportedly because Florimon's home offered a more convenient commute, (*id*. at 504:2-17); (3) less than a year after his marriage, Fernandez had moved in with Luz Aquino, his girlfriend and future mother of his child, (*id*. at 505:12-15); (4) beginning in

December 2012 and almost every month after that, Fernandez wrote checks representing the proceeds of the fraud to his girlfriend Aquino, after initially claiming he did not recall having written the checks, (*id*. at 512:5-524:17); (5) in the summer of 2014 Fernandez submitted a renewal request to obtain residency status in the United States based on his marriage to Ramirez, (*id*. at 510:12-511:6); and (6) Fernandez did not disclose to the Government his relationship with his girlfriend when shown a page of checks that included her as a payee, (*id*. at 525:5-527:13). During summation Rosario's counsel highlighted many of these facts to the jury, and concluded by saying:

> I think you can guess what's happening here. I think it's clear he wasn't telling the truth about what was going on here. It's not our job to prove to you that he was committing immigration fraud. He certainly was never charged with immigration fraud. He never even mentioned the name Luz Aquino to the government. The first time the government heard that name from him was during his testimony. At least that's what he testified to. My job isn't to prove to you that Fausto is committing immigration fraud. Actually, I have really no obligation at all. Mr. Rosario has no obligation. But it raises a doubt about whether you can believe Fausto. He knew that he had to come in and be completely honest and he wasn't. Certainly there is a big doubt that he wasn't.

(*Id*. at 731.) Fernandez was also cross-examined about his ability to manipulate and lie to Luz Aquino. During summation Rosario's counsel reminded the jury of Fernandez's ability to lie painting him as someone who had no qualms about lying to Aquino if he could benefit himself:

> Second thing you know about Fausto, his manipulation and lies to Luz Aquino. Just remember his testimony about how he knew how to craft a story to trick her. He knew how to make it seem like the checks were legitimate. In his words, these are his words, he knew how to make it credible to her. Look at the testimony of what he said about her. Even the woman closest to him in the world was someone who he could fool and someone he was willing to fool to benefit himself.

(*Id.* at 731-32.) Defense counsel also suggested Fernandez crafted his testimony so that his testimony would not contradict Florimon's, and suggested he created a story that Wellington, the only other person who could contradict his story about Rosario's knowledge of the Treasury

check scheme was out of the country in the Dominican Republic. (*Id*. at 732-33.) Rosario's counsel described Fernandez as a "good liar," (*id*. at 732), and a "skilled liar," (*id*. at 733). Based upon counsel's cross-examination of Fernandez and his summation, I find that the A-File would have merely furnished Rosario with additional impeachment material, and is therefore not material.

### c. The A-File Is Impeachment and Cumulative Evidence

The evidence outlined above that supports my finding that the A-File was not material also demonstrates that it was impeachment and cumulative evidence. However, in addition to that evidence, Rosario also explicitly concedes that the A-File is impeachment material. In an effort to bolster his argument that he made a diligent effort to obtain the A-File, Rosario essentially argues that absent the Government voluntarily producing the A-File he had no legal right to or means to obtain the A-File prior to or during his trial. Specifically, Rosario concedes that Fernandez's "A-file would only be useful for impeaching []Fernandez's testimony at trial – it contained no other information that Mr. Rosario could affirmatively use in his defense and was not likely admissible as a trial exhibit."[13] (Def.'s Reply 7.) Although Rosario's concession does tend to support his diligence argument, since the A-File "would [have been] only be useful for impeaching" Fernandez, it cannot be newly discovered under Rule 33. *See Forbes*, 790 F.3d at 406-07 (stating that "[r]elief under Rule 33 based on newly discovered evidence" requires, among other things, a "showing that . . . the evidence is not merely cumulative or impeaching").

---

[13] Rosario's assertion has merit since the contents of the A-File did not relate directly to any element of the charged offenses, its use would have been to impeach Fernandez's credibility, and therefore was likely inadmissible under Federal Rule of Evidence 608(b). *See* Fed. R. Evid. 608(b) ("Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."). However, even though the A-File itself was likely inadmissible, it would have been within my discretion to permit cross-examination of Fernandez's conduct in allegedly falsely answering questions on the immigration forms in the A-File. *Id*. ("But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of [a] witness . . . .").

### V.     <u>Conclusion</u>

For the reason stated above, Defendant's motion for a new trial is DENIED. The parties are hereby directed to contact my Courtroom Deputy Melissa Williams within one week of the date of this Memorandum and Order to reschedule a date for the sentencing. The Clerk of the Court is respectfully directed to terminate the pending motion, (Doc. 96).

SO ORDERED.

Dated: September 1, 2017
      New York, New York

Vernon S. Broderick
United States District Judge